IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

NATASHA R. GALLIEN                                                                                        PLAINTIFF

         v.                                            Civil No. 10-2157

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                                                          DEFENDANT

## MEMORANDUM OPINION

### I.   Factual and Procedural Background

Plaintiff, Natasha R. Gallien, brings this action seeking judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act").

Plaintiff protectively filed her DIB and SSI applications on November 2, 2007, alleging disability as of November 30, 2006, due to seizures, headaches, depression. Tr. 26, 58, 140. On the alleged onset date, Plaintiff was thirty two years old with a high school education and an associate's degree in accounting. Tr. 11-12, 15, 65, 149, 317. She has past relevant work as a cashier. Tr. 15-18, 145, 161-168, 210.

Plaintiff's application was denied at the initial and reconsideration levels. Tr. 70-75, 78-81. At Plaintiff's request, an administrative hearing was held on March 10, 2009. Tr. 7-50. Plaintiff was present at this hearing and represented by counsel. The ALJ rendered an unfavorable decision on August 10, 2009, finding Plaintiff was not disabled within the meaning of the Act. Tr. 55-67. Subsequently, the Appeals Council denied Plaintiff's Request for Review on August 19, 2010, thus

making the ALJ's decision the final decision of the Commissioner. Tr. 1-4. Plaintiff now seeks judicial review of that decision.

**II.     Medical History**

On November 3, 2006, Plaintiff presented to Sparks Regional Medical Center ("Sparks") with complaints of headache and syncope. Tr. 238-246. She was discharged with a prescription for Topamax and directed to follow up with her primary physician. Tr. 242. Three days later, on November 7, 2006, Plaintiff was admitted to the emergency room with complaints of dizziness, nausea, and neck pain. Tr. 248-253. She had not filled her prescription for Topamax due to cost. Tr. 248. On examination, Plaintiff had a tender left sternocleidomastoid ("SCM") muscle and appeared depressed. Tr. 251. Plaintiff was assessed with migraines, muscle spasms of the left SCM muscle, and conversion disorder.[1] Tr. 251. Plaintiff was given a prescription for Norflex and instructed to obtain treatment at Good Samaritan Clinic and apply for medication assistance. Tr. 248-249, 252.

On November 30, 2006, Plaintiff went to Good Samaritan Clinic for a follow-up regarding her seizure. Tr. 226. Plaintiff requested a release to go back to work. Tr. 226. She complained of headaches and sharp neck pain, which Topamax had helped. Tr. 226. M. Pham Russell, M.D., noted some left neck tenderness and increased Plaintiff's dosage of Topamax. Tr. 226.

On June 16, 2007, Plaintiff presented to Sparks with complaints of chest pain, dizziness, headache, body numbness, and neck pain. Tr. 257-267. On examination, Plaintiff exhibited no

---

[1] "Conversion Disorder consists of symptoms or deficits that develop unconsciously and nonvolitionally and usually involve motor or sensory function." Manifestations resemble a neurologic or other physical disorder, and sometimes involve seizures. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1574-1575 (Robert S. Porter, M.D., et al., eds., 19th ed. 2011).

neurological deficits. Tr. 261. Chest x-rays were normal. Tr. 255. An electrocardiogram ("ECG") was normal. Tr. 262. A CT of Plaintiff's brain revealed a focal linear area of decreased density in the left anterior parietal frontal lobe region, unchanged from November 3, 2006, which could represent a non-acute area of encephalomalacia versus a congenital variation. Tr. 254, 263. Plaintiff was assessed with atypical chest pain and discharged in stable condition. Tr. 261.

On November 25, 2007, Plaintiff was admitted to the emergency room at Sparks with complaints of a possible seizure, neck pain, headache, and weakness. Tr. 295-313. Plaintiff's neurological examination was within normal limits, although she would not speak. Tr. 301-302. It was noted that Plaintiff had been prescribed Topamax for headaches, but was noncompliant. Tr. 311. John Weddle, M.D., found that Plaintiff may have had an absence seizure, but noted it was questionable at best. Tr. 311. Plaintiff was diagnosed with psychomotor seizure with medication noncompliance and discharged with follow-up instructions. Tr. 305-306, 311-313.

On November 29, 2007, Plaintiff was transported to the emergency room at St. Edward Mercy Medical Center ("St. Edward's") after she was found lying in bed with her eyes open, but was unable to speak. Tr. 346-365. Plaintiff complained of facial numbness and neck pain. Tr. 348. Her neurological examination was within normal limits and she exhibited no sensory or motor deficits. Tr. 351. An ECG was normal. Tr. 354, 363-364. A CT of Plaintiff's head revealed a tiny old lacunar infarct or area of scar in the left cerebellum, but no hemorrhage or definite acute brain abnormality. Tr. 357, 365. There was a cleft-like appearance in the left frontoparietal cortex that was thought to be a focal area of encephalomalacia related to remote trauma. Tr. 357.

On January 2, 2008, Plaintiff presented to Sparks after a possible absence seizure prior to being arrested. Tr. 386-403. Plaintiff's physical examination was within normal limits. Tr. 393,

402. She was given prescriptions for Topamax and Ativan and discharged into police custody. Tr. 390, 400.

On January 16, 2008, Plaintiff saw Patricia J. Walz, Ph.D., for a consultative mental evaluation. Tr. 316-321. Plaintiff admitted feeling depressed and anxious, but denied any suicidal or homicidal ideation. Tr. 316. She denied any formal mental health treatment, but stated she took antidepressants for thirty days in 2007 and was currently taking Lorazepam and Topamax. Tr. 317. When asked about trauma, Plaintiff reported being hit by a car at the age of two. Tr. 317. She also reported flashbacks associated with Hurricane Katrina. Tr. 317. Plaintiff had been married once and had seven children. Tr. 318. She was never terminated from any previous jobs. Tr. 318. She stated she got along with coworkers and supervisors. Tr. 318. When asked about daily activities, Plaintiff stated she would lie in bed and watch television most of the time. Tr. 320.

On examination, Plaintiff was cooperative, but somewhat sullen. Tr. 319. Thought processes were logical, but a little concrete, and she demonstrated tangential thinking. Tr. 319. Thought content was notable for a history of suicidal thinking. Tr. 319. After administering various tests, Dr. Walz estimated Plaintiff's IQ to be within the 65-75 range. Tr. 319. She noted that Plaintiff's social skills were adequate and her speech was clear and intelligible, although run-on in nature. Tr. 320. Plaintiff appeared very scattered, as if she had difficulty keeping her mind on a task. Tr. 320. Speed of information processing was rapid. Tr. 320. Dr. Walz diagnosed Plaintiff with post traumatic stress disorder ("PTSD"), chronic, related to hurricane survival, rule out mood disorder, rule out thought disorder, and rule out mild mental retardation. Tr. 320. She estimated Plaintiff's Global Assessment of Functioning ("GAF") score at 40-45. Tr. 320.

In a Psychiatric Review Technique Form ("PRTF") dated February 11, 2008, Jay Rankin, an agency specialist, determined Plaintiff's impairments did not meet or equal the criteria for Listing 12.06 (anxiety-related disorders), as she had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 325-338. In a Mental Residual Functional Capacity ("RFC") Assessment, Rankin found that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision and without being distracted by others, complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Tr. 339-342. Rankin found that Plaintiff was not significantly limited in the twelve remaining work-related categories. Tr. 341. He concluded that Plaintiff was capable of performing unskilled work. Tr. 341.

Plaintiff supplied medical records from Arkansas Department of Corrections from June 16, 2008, through November 11, 2008. Tr. 404-503. While incarcerated for credit card fraud, Plaintiff was treated for right lower extremity pain, colds, minor burns, nausea and vomiting, lightheadedness, headaches, and seizure activity. Tr. 404-503. Peter Edwards, M.D., noted a diagnosis of pseudoseizures. Tr. 498-499. He found that malingering needed to be ruled out. Tr. 499. Plaintiff was treated for seizures on July 30, 2008, August 12, 2008, August 28, 2008, and September 4, 2008. Tr. 418, 431-439. While incarcerated, Plaintiff was treated with ibuprofen, Topamax, Diazepam, Propanolol, and Citalopram. Tr. 441-442, 444, 460-474. She also had routine counseling, but was

noted to be functioning without major difficulty. Tr. 500. Prior to her release, Plaintiff reported feeling very positive and overall functioning was stable. Tr. 497. She was made aware of mental healthcare options, such as Vista Health or Western Arkansas Counseling and Guidance Center ("WACGC"). Tr. 497.

On March 31, 2009, Plaintiff was treated at Sparks for seizure activity. Tr. 505-507. An MRI of Plaintiff's brain revealed a linear abnormal signal involving the left frontal lobe consistent with a focal area of cystic encephalomalacia. Tr. 506. However, there was no appreciable change since the June 2008 scan. Tr. 506.

Plaintiff submitted additional evidence from Cooper Clinic and WACGC to the Appeals Council. In April 2010, Plaintiff was referred to Tonya Phillips, M.D., a neurologist. Tr. 509-525. Plaintiff described her seizures as shaking all over, becoming unresponsive, and sometimes losing bladder and bowel control. Tr. 509. She stated she became very confused and agitated after a seizure. Tr. 509. She was previously taking Topamax, but was switched to Depakote, which worked well for her. Tr. 509. Plaintiff's neurological examination was within normal limits. Tr. 510. Her memory was intact and attention span and concentration were good. Tr. 510. Dr. Phillips noted that Plaintiff was pregnant and was taking a smaller dose of Depakote. Tr. 511. She concluded that Plaintiff suffered from complex partial seizures with secondary generalization and switched Plaintiff to Keppra. Tr. 511.

At a follow up appointment in May, Plaintiff stated she had not had any seizures since taking Keppra. Tr. 512. However, she did complain of leg pain, poor concentration, and balance problems. Tr. 512. Dr. Phillips encouraged Plaintiff to remain active and increased her dosage of Keppra. Tr. 512.

On May 27, 2010, Dr. Phillips wrote a letter stating Plaintiff's seizures may impair her ability to function, work, and drive. Tr. 513. Dr. Phillips did not specify to what extent Plaintiff would be impaired, but she did note that Plaintiff had been unable to maintain employment due to her epilepsy. Tr. 513. By June 2010, Plaintiff was doing better and had only one seizure episode that lasted about ten minutes. Tr. 514. Dr. Phillips noted that Plaintiff was tolerating the Keppra well without any difficulties or side effects. Tr. 514. In fact, Plaintiff reported that she had not experienced any headaches and was pretty happy with her medications overall. Tr. 514. Dr. Phillips increased Plaintiff's dosage of Keppra since she was still having some seizure activity, but noted that her seizures were significantly better. Tr. 514.

On June 3, 2010, Plaintiff presented to WACGC. Tr. 527-541. Plaintiff reported depression, anxiety, childhood trauma, PTSD, and mood swings. Tr. 527, 535-537. She reported a history of seizures, but stated she had not had a seizure since January. Tr. 527. She was currently taking Keppra for her seizures. Tr. 535. Plaintiff was diagnosed with depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified, and PTSD. Tr. 527, 529. She was given a GAF score of 54, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. Tr. 529.

Plaintiff saw Ewa Beyga for medication management. Tr. 535-541. On July 13, 2010, Plaintiff was pleasant and cooperative, but appeared depressed and anxious. Tr. 538. Thought processes were goal-directed and logical and thought content was negative for delusions or obsessions. Tr. 538. Plaintiff reported auditory and visual hallucinations, but none were noted during examination. Tr. 538. Judgment and insight were appropriate, and Plaintiff's memory was intact. Tr. 538. Plaintiff was able to concentrate throughout the interview and displayed no

cognitive deficits. Tr. 538. Intelligence was thought to be within the average range. Tr. 538. Ewa Beyga, M.D., diagnosed Plaintiff with major depression, recurrent with psychotic features, rule out bipolar II disorder with psychotic features, PTSD, generalized anxiety disorder, panic disorder with agoraphobia, and learning disorder not otherwise specified. Tr. 539. He estimated Plaintiff's GAF score at 48. Tr. 539. Dr. Beyga prescribed Zoloft, Geodon, and Ambien. Tr. 539-540.

### III.   Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether

the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits her physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform her past relevant work; and (5) if the claimant cannot perform her past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given her age, education, and work experience.  *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a).  If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled.  *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

**IV.    Discussion**

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity at any point since November 30, 2006, the alleged onset date.  Tr. 60.  At step two, the ALJ found Plaintiff suffers from migraines, seizures, and mood disorder, all of which were considered severe impairments under the Act.  Tr. 60.  At step three, she determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  Tr. 60-62.  At step four, the ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels, but could not drive, climb ladders, ropes, and scaffolds, and must avoid unprotected heights and dangerous equipment.  Tr. 62-65.  Mentally, she determined Plaintiff could perform repetitive, routine work with non-complex, simple instructions that are learned by rote with few variables and little judgment required, supervision is concrete, direct, and specific, and contact with the public and coworkers is incidental and superficial.  Tr. 62-65.

Based on these limitations, the ALJ determined Plaintiff was unable to perform her past relevant work. Tr. 65. However, after receiving vocational expert testimony, the ALJ found jobs existing in significant numbers in the national economy that Plaintiff could perform.[2] Tr. 65-66. Accordingly, the ALJ determined Plaintiff was not under a disability from November 30, 2006, the alleged onset date, through August 10, 2009, the date of the decision. Tr. 66-67.

On appeal, Plaintiff contends: (1) the Appeals Council failed to consider her newly submitted evidence; and (2) the ALJ failed to give proper weight to Dr. Walz's opinion. *See* Pl.'s Br. 5-7. For reasons discussed below, the undersigned concludes that Plaintiff's arguments are without merit.

  A. <u>Additional Evidence Submitted to the Appeals Council</u>

First, Plaintiff contends this case must be reversed because the Appeals Council failed to consider the additional evidence submitted from WACGC. *See* Pl.'s Br. 7. When new and material evidence is submitted to the Appeals Council, the Appeals Council is required to "evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.1470(b). This newly submitted evidence becomes part of the administrative record even though the evidence was not originally before the ALJ. *Browning v. Sullivan*, 958 F.2d 817, 823 n. 4 (8th Cir. 1992).

If the Appeals Council does not consider the newly submitted evidence, a reviewing court may remand the case if the evidence is new and material. *See Williams v. Sullivan,* 905 F.2d 214, 216 (8th Cir. 1990). If the Appeals Council considers the new evidence but declines to review the

---

[2] The ALJ determined Plaintiff could perform the requirements of representative unskilled occupations such as hand packager (medium), of which there are 7700 jobs regionally and 951,000 jobs nationally, poultry deboner and eviscerator (light), of which there are 6000 jobs regionally and 140,000 jobs nationally, maid (light), of which there are 5300 jobs regionally and 630,000 jobs nationally, and inspectors and sorters (sedentary), of which there are 1000 jobs regionally and 68,000 jobs nationally. Tr. 66.

case, the district court must determine whether the administrative record on the whole, including the new evidence, supports the ALJ's decision. *Browning*, 958 F.2d at 823. To warrant remand, it must be reasonably likely that the new evidence, if available to the ALJ, would have resulted in an award of benefits. *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997).

In this instance, the Appeals Council specifically listed that it considered the evidence from Cooper Clinic, but failed to list the evidence from WACGC. Tr. 4. However, these records were made a part of the administrative record, which lends support to the interpretation that the omission was inadvertent error rather than an active failure to consider. Regardless, the court finds that the records from WACGC show a subsequent deterioration of a previously non-disabling condition. *Jones*, 122 F.3d at 1154 ("An implicit requirement is that the new evidence pertain to the time period for which benefits are sought, and that it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition."). Plaintiff did not seek additional treatment until June 2010, which was ten months after the ALJ rendered her decision. Considering Plaintiff had no history of formal mental health treatment prior to WACGC, her treatment indicates a subsequent decline which would be better addressed a new application for benefits. *Id.* Moreover, even if these records had been available to the ALJ, the two appointments add little to the overall evidence and do not show a reasonable likelihood of a different outcome. As such, Plaintiff's argument is without merit.

### B. RFC Determination

Plaintiff contends the ALJ failed to accord proper weight to the opinion of Dr. Walz, the consultative psychological examiner. *See* Pl.'s Br. 5-7. At the fourth step of the evaluation, a disability claimant has the burden of establishing his or her RFC. *Eichelberger*, 390 F.3d at 591;

*Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). A claimant's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Masterson*, 363 F.3d at 737. The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination. *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

Plaintiff argues that the ALJ erroneously dismissed Dr. Walz's opinion. *See* Pl.'s Br. 5-6. Her argument is misplaced. The ALJ did not discount Dr. Walz's entire opinion. Rather, she discounted the portion of Dr. Walz's opinion that stated mild mental retardation needed to be ruled out. Tr. 64-65. Dr. Walz was not a treating physician, and, as such, did not have the benefit of treating Plaintiff on a regular basis. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (consulting physician's opinion entitled to no special deference). Furthermore, Plaintiff's completion of her associate's degree in accounting and her ability to work as a cashier weigh against a finding of mental retardation. Tr. 65. Finally, Plaintiff did not allege mental retardation in her initial claim for benefits, nor was it specifically discussed at the administrative hearing. *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (ALJ is not obliged to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability). As such, the ALJ did not err in discounting this portion of Dr. Walz's findings.

Additionally, the ALJ did not err in failing to adopt Dr. Walz's GAF scores. GAF scores cover only a snapshot in time and are very subjective in nature. *See Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). While the GAF system provides insight into a claimant's overall level of functioning, it is by no means dispositive on the issue of disability and must be considered in conjunction with other medical evidence. Other than her consultative appointment with Dr. Walz and mandatory counseling while incarcerated, Plaintiff had no history of mental health treatment. *See Kirby,* 500 F.3d at 708-09 (claimant had not sought formal treatment by a psychiatrist, psychologist, or other mental health care professional). Furthermore, while incarcerated, Plaintiff was noted to be functioning without major difficulty. Tr. 500. In fact, Plaintiff's psychiatrist found "no real evidence of depression," but agreed to continue Celexa. Tr. 498. The ALJ considered the medical evidence of record, including Plaintiff's GAF scores, but determined she was capable of employment. Substantial evidence supports this determination.

V.      **Conclusion**

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed. Accordingly, Plaintiff's complaint should be dismissed with prejudice.

IT IS SO ORDERED this 6th day of January 2012.

*/s/ J. Marschewski*
HONORABLE JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE